IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| ADELINA BLANKENSHIP | Docket No. 1:23-cv-1328 |
| Plaintiff | |
| v. | |
| YESENIA LASSITER | |
| Defendant | JURY TRIAL DEMANDED |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Adelina Blankenship for her complaint against Yesenia Lassiter, avers with knowledge as to their own acts and otherwise on information and belief as follows:

### THE PARTIES

1.      Plaintiff Adelina Blankenship is a natural person residing in Prince William County Virginia, and is a citizen of Virginia.

2.      Defendant Yesenia Lassiter is a natural person residing at Dearmey Creek Way, in Bristow, VA, 20136, and is a citizen of Virginia.  Lassiter has a daughter, and because the daughter is a minor, this complaint will omit her name ("Daughter').  The Daughter attended Gainesville Middle School.

<u>JURISDICTION AND VENUE</u>

3.     This civil action for denial of civil rights arises under the federal laws of these United States, including 42 U.S.C. §1983,  20 U.S.C. §1400, et. seq, and 18 U.S.C. § 1030, et. seq., the Declaratory Judgment Act, including 28 U.S. Code § 2201, and the common laws of the Commonwealth of Virginia. This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367. Venue is proper under 28 U.S.C. §§ 1391(b). Lassiter is subject to personal jurisdiction in this district.

<u>FACTS</u>

4.     Your Plaintiff Adelina Blankenship, ("Blankenship") is a Virginia licensed teacher certified by the Commonwealth of Virginia as a teacher authorized to participate with students with cognitive disabilities (i.e, students with **Sp**ecial **Ed**ucation concerns hereafter "SPED") .

5.     A SPED teacher generally occupies two functions, first as a case-worker that tracks the SPED students, and secondly as a teacher that provides accommodations to students with learning disabilities during class. For example, Blankenship was assigned to the Daughter as a case-worker for her seventh and eighth grade years in 2022-23 at Gainesville Middle School, and as the co-teacher for an English class that included Daughter along with other SPED students.

6.     The Daughter has significant medical documentation for a '504 plan', see 8 VA C20-671-10.  A "'504 Plan' means a written plan required under § 504 of the Rehabilitation Act of 1973 (29 USC § 701 et seq.), as amended. "A student's 504 Plan details modifications, accommodations, and services that are needed for the student with a medical diagnosis to participate in and enjoy the benefits of school programs at the same level as [her] peers without … disabilities." 8VAC.20-671-10.  In short, the Daughter's 504 Plan is based on a blood flow problem, one that does not affect her cognitive abilities *at all*. ("Medical Disability")

2

7.    Although the Daughter's Medical Disability does not affect her mental attributes, it may be the case that the medications that she takes affect her ability to participate in school – examples to be provided later.

8    The Daughter did not initially qualify as a SPED student. Multiple times when employees of Prince William County attempted to measure the cognitive attributes of the Daughter, the measurements failed to detect that the Daughter had any attributes below the threshold that would necessitate special education programs from Prince William County. The Daughter was repeatedly tested until the county issued her an IEP.

9.    Lassiter frequently, drastically, and transparently exaggerated her daughter's alleged mental and physical disabilities. During at least one meeting when employees from Prince William County were explaining certain bases for disabilities, employees read out several bases, and Lassiter claimed that the Daughter was legally blind. Lassiter's basis for this was that a doctor claimed that the Daughter periodically lacked the ability to focus. Lassiter never provided any support that her Daughter was "legally blind."

10.    Prince William County eventually agreed to provide the Daughter with SPED services – for reasons unknown.

11.    The Daughter only sporadically attended school, and when she acquired an IEP and finagled SPED services from Prince William County, the Daughter's attendance basis declined further. There was one quarter session of school wherein the Daughter failed to attend for all but three days – two days of which she spent less than one hour at the school.

12.    Multiple times in which the Daughter returned to the school, teachers heard the Daughter describing that her absence was based not on her Medical Disability, but rather extended vacations with her family.

13.     Nevertheless, Lassiter demanded unusually frequent planning meetings relative to the average, legitimate SPED student. Plaintiff estimates that Prince William County spent approximately 100 man-hours on Lassiter and her Daughter, whereas the average SPED case IEP includes approximately 4-6 hours, and are typically finalized in a single parent-meeting lasting 60 minutes based on medical and cognitive data.

14.     Lassiter's SPED meetings were defined by suppositions of potential (but undocumented) medical/psychological issues, constant blame upon Prince William County employees, and alleged hardships that her daughter endures, mostly related to physical issues, rather than cognitive issues, which are generally irrelevant to SPED concerns.  Rarely would Lassiter focus on any constructive solutions, but rather quibble over vocabulary concerning issues and academic goals.

15.     Because SPED programs have finite resources, a host of instances exist wherein a Prince William County SPED instructor had to devote time to the Daughter and Lassiter's demand for attention to Daughter's phantom issues, rather than students that legitimately merited SPED services.

16     Lassiter has turned politician and is now a candidate for the Prince William County school board.  See Exhibit 1.  As part of her candidacy she has issued videos on a social media program called 'TikTok' outlining her political positions, as well as her alleged tribulations with the Prince William County school board.  Lassiter issues these videos through the account titled: justicefight4pwcspedkids, (collectively, "Campaign Videos").

17.     Justicefight4pwcspedkids is exemplary of an Internet phenomenon called "Performative Caring" in which individuals decry alleged social ills while the cameras are pointed at their face while they emote. Performative Caring is characterized by demanding more spending

and ambiguous action (usually "do something") to solve an alleged social wrong by large institutions, agnostic to resources and science.

18.     Performative Caring is an exploitive, sensational event. It usually involves the intentional misrepresentation of an adversary's words or actions.  The point of Performative Caring is that it is the modern version of passion play, where good and evil are starkly and childishly established for simplistic audiences.

19.     An example of Lassiter's Performative Caring occurs in a Campaign Video titled 'This is one person that oversees children with intellectual abilities and autism. Tag every autistic.' allegedly concerning wrongs applied to the Daughter, the camera is pointed at the face of Lassiter, See Exhibit 2, and she emotes while describing an alleged wrong. In this particular video, an employee of Prince William County states as an example of establishing work skills that they train highly autistic students in transition services to fold shirts:

> This is Megan Kellner, the related service in the center…through the transition plan are also agencies that are going to help with jobs and providing those services in the workforce, *for example, our students with intellectual disabilities that are working out in TARGET or GOODWILL [or] SALVATION ARMY sorting clothes*, folding clothes…what services they need to be successful in those job situations, once they start working out in the community.

The response to this was as follows from Lassiter's Advocate, present in the meeting:

> *Just to be clear* [sic], this is for getting people jobs at TARGET and working at GOODWILL sorting clothes, so that's what this is…

To which Kellner replied:

> [No], these are just examples, my background in students with intellectual disabilities and autism, so looking at their job descriptions, they would not be considering law school, it'd be what jobs can they do in the community and how is it…

Accordingly, the "advocate" cut her off to state:

I disagree with you. Autistic Kids can go to law school. Autistic kids can go to law school, and they can do more than sorting clothes at GOODWILL – and I find it pretty offensive. But with that being said, I want to know…[cut]

Then, Lassiter concludes with an impassioned to plea to reach to lawyers with autism to circulate the video: "to let all of our children with autism know that you can go to law school."

20.     Naturally, part of Performative Caring is to demonize the adversary as a caricature. This is the photograph, Exhibit 3, that Lassiter posted of her demonized adversary, which served as a still image any time that audio of Megan Kellner was talking on the audio feed.  Kellner discussed children with intellectual disabilities and autism; the "advocate" altered the meaning of Kellner's example to transform it into a stark statement that 'Children with autism cannot go to law school.' This photographic 'still' was meant to disparage Megan Kellner as an inaccurate caricature.

21.     Also, the particular Campaign Videos concerning this exchange included the following description by Lassiter: "This is one person that oversees children with intellectual abilities and autism. Tag every autistic lawyer you know! Lets [sic] show our autistic community what IS possible!!! Also you can call 703-791-8581 or email KellneMA@pwcs.edu to make your voice heard!@PWCS#autisticlawyers #autism #fyp"

22.     Another Campaign Video of Lassiter includes the Daughter in a public speech berating the School Board of Prince William County for their alleged denial of her right to an education.     https://www.tiktok.com/@justicefight4pwcspedkids/video/7248074081969458478. This might be more credible; however, proximate in time with this public speech is a request by Lassiter for the submission of third parties for their stories concerning Prince William County's denial of an education, because the Daughter is an actress represented by an agent that is seeking

stories concerning denial of education for SPED students ("Media Solicitation").  This Media Solicitation is attached as Exhibit 4.

23.     The Daughter has no stated medical or cognitive limitations concerning her acting credentials – as contrasted with her education credentials.

24.     After Prince William County learned that Lassiter was posting video-recording SPED meetings and posting deceptive snippets thereof online, Prince William County sent Lassiter an email reminding her that it is forbidden to video-record in another Campaign Video titled: 'PWCS objects to us being recorded,' wherein:

  A. Lassiter displayed the email and the Prince William County regulation forbidding video recordings, in which Prince William County further noted that it does not video-record the meetings.

  B. Then Lassiter posted a notice preceding a SPED Meeting between Prince William County and Lassiter from the commercial e-meeting provider, ZOOM, that displays a message that ZOOM meetings are being recorded (without reference to whether such recordings are video or audio). See Exhibit 5.

  C. Lassiter then accused Prince William County of illicitly video-recording SPED meetings (which it doesn't) while forbidding Lassiter from doing so.

However, this 'recording message' does not originate from the county; Prince William County does not have a proprietary e-meeting platform, and instead uses ZOOM. This 'recording message' is a generic message from Zoom, over which Prince William County has no control.  This message, as depicted by ZOOM, is depicted in Exhibit 6. Note that this message is identical to message of the video referenced in the preceding allegation.

https://www.awesomescreenshot.com/blog/screen-recording/how-to-record-a-zoom-meeting

25. After Prince William County learned that Lassiter was video-recording SPED meetings and posting deceptive snippets of them online, Prince William County stopped utilizing its cameras to depict Prince William County employees during the meeting.

26. In a three-part Campaign Video titled 'Feeling Gaslit in IEP Meetings:'

    A.   Lassiter claimed that the Daughter was being prevented from using the bathroom at-will, and without notice, at the school, and claimed that the Daughter was close to having 'bathroom accidents' at school.

    B.   Blankenship's voice can be identified as explaining that all students need to have an electronic bathroom pass that identifies the students and the bathroom to which they are headed prior to using a bathroom during class.

    C.   Blankenship further specifies that the Daughter actually has a bathroom accommodation (i.e., "fastpass")  based on her physical disability (i.e., not cogitative disability) that because of Daughter's medication for her physical disability, the Daughter has a physical, expedited bathroom pass that a teacher is required to approve.

27. Contrary to the implications that Lassiter is being 'gaslit,' every student must fill out a bathroom pass to go to the bathroom for multiple reasons; including, that if there is an emergency, teachers must know where their students are at all times – *particularly SPED students*. Teachers have no discretion in this matter; their behavior is governed by regulations related to fire safety.  PW Co. Ordinance 408-1. Furthermore, students often seek to use the bathroom to evade work; and the bathroom visit in question in the 'Feeling Gaslit in IEP Meetings,' the Daughter was missing from class for more than 30 minutes. The extreme delinquency triggered a minor

emergency that day as school teachers went to find the Daughter in the school and could not in a reasonable amount of time. Upon watching the surveillance video, the Daughter can be seen strolling down the hallways of the school, passing two usable bathrooms (including the one explicitly allotted to girls in her grade). Also, the inclusion of the medication and its effects in the IEP Plan (i.e., the learning disability plan), as well as the 504 Plan (i.e., the physical disability plan), was artificial and only included pursuant to the demands by Lassiter to duplicate the medical requirements into the learning requirements.

28.     When the videos of the audio recordings (i.e., videos that lacked live images of participants) did not receive the same number of hits in TikTok as the videos of the live participants, Lassiter supplied Prince William County with a physician's note claiming that she has a "traumatic brain injury" and demanded that Prince William County allow her to video record the meetings of live participants to accommodate her disability. In a Campaign Video titled 'PWCS breaks ADA laws yet again!,' Lassiter demands that Prince William County accommodate her with videos and video recordings, to which a Prince William County employee demurs. Lassiter then demands that the employee not only cite the regulation, but display an image of the regulation during the meeting. When the Assistant Principal for Gainesville High School stated that they would gladly send her the regulation at the conclusion of the meeting, Lassiter refused to participate in the meeting. Furthermore, Lassiter displays, throughout the video, the telephone number of the Prince William County employee that denied Lassiter's request to permit video recording.

29.     In another Campaign Video titled: "Lies, Lies, and More Lies:"

A.     Lassiter video-recorded the meeting contrary to Prince William County regulations, and express instructions sent to her by Prince William County.

B.      Lassiter displays a first portion video, from an unspecified date, in which the Gainesville Middle School principal advises Lassiter that SPED meetings concerning her daughter can occur in a window that closes at 11:00am.

C.      Then Lassiter displays a second video portion, from an unspecified date, in which the Gainesville Middle School principal mentions that teachers are only able to meet with Lassiter for a SPED conference directly above a photograph of Blankenship.

D.      The video depicts the phrase Lies, Lies, and More Lies directly above a video image of Blankenship. See Exhibit 7.

30.      No one was lying to Lassiter about scheduling in video of the preceding allegation. The meetings with Lassiter are so lengthy, contentious, and abusive that only certain teachers, personnel, and SPED teachers are permitted to participate – making scheduling an ever-changing feat.  So, teachers are not missing classes on a regular basis, the IEP team created a rotation schedule of which general education teachers would attend her IEP meeting.  Normally, it's the same general education teacher for the entire year, but because Lassiter's meetings were so frequent and lengthy, it was not fair for students to be missing their teachers and classes on an ongoing basis.

31.      In another Campaign Video titled 'PWCS knew that holding the meeting without parents there was illegal so they had to fabricate a rea:"

A.      Lassiter questioned rubrics by which the Daughter was being judged for progress.

B.      When several rubric criteria are explained to Lassiter, and a "social scientist" accompanying Lassiter, the "social scientist" claimed that several criteria, generic to student measurement "are impossible." When an employee of Gainesville High School attempts

to explain the criterion in more detail, the "social scientist" derides his explanation, based not on data but by reference to her credentials as a PhD, and patronizingly tells the speaker that it is not his fault that he cannot explain the criterion because the Daughter's teacher is "absent" from the meeting. The "social scientist" purports to speak for, and as an advocate for, Lassiter.

C.      Lassiter and the "social scientist" blame "the teacher" for problems with the rubric stating that she has providing impossible-to-measure characteristics, and suggests that the data was fabricated. The "social scientist" reminds the attendees that she has a PhD a few more times and then asks to continue the meeting when "the teacher" can be available to explain the criteria. By the way, the criteria is simplistic and easily understandable, and literally assigns a number (i.e., 1-5) to an essay based on attributes (e.g., grammar). The numbers are computed for a final score.

D.      After Lassiter demands that they adjourn the meeting, the Prince William County staff remind Lassiter that they are creating the IEP for her continued education at Gainesville High School, and they are going to continue the meeting regarding the new IEP irrespective of past IEPs – and that the result is simply a proposed IEP.

E.      The Principal for Gainesville High School invites the "social scientist" to help him: "let's word it in a way that is more clear." However, Lassiter and "social scientist" nevertheless demand to adjourn the (normally thirty minute) meeting because it had been going on for three hours merely that day.

F.      An employee for Prince William County headquarters chimed in to remind Lassiter that the meeting was nevertheless scheduled for more time, and that if Lassiter wished to exit the meeting that she was allowed to do so, and that would gladly have a five minute break. Parents are not required to participate in IEP meetings.

G.     The "social scientist"  and Lassiter state:

1. "If you're going to try to hold us hostage here without letting us go on bathroom breaks or do anything else *you're going to have a lawsuit.*" (emphasis added)

2.  Responsive to an employee's suggestion of a five-minute break: "No ma'am, no ma'am; that's not sufficient. You're not going to hold us hostage here. So you're either going to reschedule for another date or…[inaudible]…because we've been talking for three hours straight. No ma'am, no ma'am." (To which the Prince William County employee said: "I just said that we can take a break.")

3.   "Did you give us prior notice that you would be holding this meeting until this meeting was complete?"

4.   "I just want you to know that we're filing a formal complaint."

5.   "If you're trying to *illegally* hold a meeting…" (emphasis added)

6.   "You're holding us hostage. You're not allowing us to leave the meeting, and you are forcing it to continue against our will."

7.   "You are threatening to illegally hold this meeting…and you're going to have a problem *and a lawsuit*" (emphasis added)

8.   "You better take a break and use your five minutes to call your general counsel."

9.   "We'll be calling [inaudible] and some others." (In reference to their litigation attorneys)

10.   "I have not eaten at all today! I've been up since six this morning!...I have not eaten! What you're doing is illegal!"

11.   "I want fifteen! (minutes)"

32.     The Campaign Video 'PWCS knew that holding the meeting without parents there was illegal so they had to fabricate a rea" concludes with a Prince William County employee concluding the e-meeting based on the threats from Lassiter and the "social scientist." The Campaign Video ends as the "social scientist" states "What threats? ***Legal action***…for violating the law!?!" (emphasis added).

33.     In the Campaign Video 'PWCS knew that holding the meeting without parents there was illegal so they had to fabricate a rea," Lassiter's video included an artificial depiction of a live meeting as the audio played. See <u>Exhibit 8</u>. In this depiction, every Prince William County employee and teacher includes an image that Lassiter acquired from a prior meeting. Blankenship is depicted by name with a large red tag under his image stating "Absent," indicating the she is the teacher who ought to have attended the meeting to discuss prior IEP criteria, but did not do so.

34.     In the meeting that would eventually be memorialized as Campaign Video 'PWCS knew that holding the meeting without parents there was illegal so they had to fabricate a rea," Blankenship did not attend because she is a teacher, and the meeting took place in the summer. She is prohibited from working during this time. The other attendees are principals or staff at Prince William County headquarters that work year-round or more than staff-teachers. Furthermore, since the subject of the meeting was the Daughter's future IEP, the correct personnel would be employed by Gainesville High School, which the Daughter would soon attend. Blankenship's input was not allowed or pertinent to the meeting. Furthermore, it was generous of those that did attend to hold an untimely and lengthy meeting.

35.     Lassiter's public exploitation of her daughter is shameless and calculated to garner inappropriate sympathy for Lassiter's benefit.  For example, Lassiter claims on TikTok and in meetings that she audio records that the Daughter is "on chemo meds" (i.e., chemotherapy

medications). The Daughter is not undergoing chemotherapy, nor does the daughter have cancer. This is known because employees of Gainesville Middle School pointedly asked if the Daughter had cancer, or was undergoing chemotherapy, and if Lassiter could substantiate her claims. Lassiter could not, but stated that the medications that the Daughter takes has effects similar to chemotherapy medications. She also feigns cancer-status for her daughter in her Campaign Videos, including the video 'Admins don't have empathy' See, e.g. Exhibit 9 ("Well the thing is that her chemo meds in the morning make her really…"). Lassiter states that:

> These admins have NO EMPATHY? My daughter participated in her IEP Meeting on this particular day so their regulation didn't apply. They just like to discriminate [against] children with disabilities and love the power they hold!...It is truly a power flex they love to hold over children with disabilities."

36.     Lassiter purposefully gives the impression that her Daughter has cancer to evoke significant emotional support. Exemplary comments related to this post are provided as Exhibit 10, all taken from the TikTok comments to the Campaign Video. 'Admins don't have empathy'

37.     Part of the harm that Prince William County employees have endured, including Blankenship, is the constant verbal abuse and feeling of futility because Lassiter tells her Daughter that she, i.e. the Daughter, cannot receive an education at Prince William County schools and that her teachers are purposefully conspiring to ensure Daughter's lack-of-education. Multiple times in Prince William County interactions with the Daughter, when they asked if the Daughter was prepared to take a test, the Daughter replied that her mother, i.e., Lassiter, told her that she was denied a proper education and was incapable of passing tests. Notwithstanding this feedback from Lassiter, the Daughter acquired testing results on her Standards of Learning Test provided by the Commonwealth of Virginia *that explicitly and directly contradicted* her SPED status.

38.     For one of the Daughter's math classes, Lassiter demanded SPED services; and when Gainesville Middle School explained to Lassiter that the Daughter was in the highest

mathematics class available for the Daughter's grade level, Lassiter demanded SPED mathematics services nonetheless. Prince William County does not provide SPED services for high-level middle school math classes, because doing so is mutually exclusive with the goals of the SPED program that emphasizes assistance for low-performing students.

39.    Furthermore, when the IEP included a space wherein the student describes the particular career in which she believes that she would like to purse, the Daughter entered the career "cosmetologist," but in a meeting attended by Lassiter, she shouted down her daughter to order the Daughter to seek a legal career in which she (i.e., the Daughter) could 'advocate' for children like her.  The daughter during the video conference readily agreed when confronted by Lassiter. Blankenship, who entered the Daughter's preferred career, and is married to an attorney, (i.e., me) that multiple physicians suggested would be a candidate for autism, would have no problem entering "attorney" as a career ambition into a SPED student's file.  Blankenship, a veteran of many parties populated by patent attorneys, knows well the intersection between the legal careers and autism.

40.    Prince William County has no procedures for testing the mental faculties of parents that repeatedly demand that their children are SPED against the probability of all available evidence. That is to say, there is no way to determine whether parents are motivated, for example, by Munchausen Syndrome by proxy, other mental disorder, or motivation unrelated to the needs of the student. Munchausen Syndrome by proxy is described by the *Child and Family Services Manual* by the Virginia Dept. of Social Services, Ed: August 2020, as follows:

> A condition characterized by habitual presentation for hospital treatment of an apparent acute illness, the patient giving a plausible and dramatic history, all of which is false. Munchausen syndrome by proxy occurs when a parent or guardian falsifies a child's medical history or alters a child's laboratory test or actually causes an illness or injury in a child in order to gain medical attention for the child, which may result in innumerable harmful hospital procedures.

Citations Omitted. Accordingly, teachers are typically required to accept the verbal suggestions of parents concerning cogitative diagnoses, even when they are measurably disproven by testing and academic results.

41.    The Campaign Videos and other public statements are part of a purposeful campaign by Lassiter to achieve multiple goals. Among those goals include strong-arming, and otherwise bullying Prince William County, into granted accommodations that neither Lassiter nor the Daughter merit, e.g. excused extended absences, the ability to make-up and miss assignments, home-bound services (I.e., Prince William County paid teachers to teach the Daughter at her home), etc. However, the newest venture of Lassiter, arising in the last semester of 2023, is to demand that the Daughter attend Colgan High School, a Prince William public school that emphasizes performing arts. As earlier mentioned, Lassiter believes that the Daughter is a budding performing artist and actor. When Lassiter failed to turn in the application to Colgan by the applicable deadline; Lassiter claimed disability and asked for an accommodation to extend the deadline to apply (which doesn't exist as an accommodation). Although Prince William County allowed Lassiter her late-filing "accommodation," Prince William County denied on the merits Lassiter her demand for the Daughter to attend Colgan High School, a school for which Lassiter is not zoned. See Exhibits 11 and 12. This act immediately preceded Lassiter's entry into politics for the Prince William County school board. When Lassiter publicly accused Prince William County of discrimination against the disabled, she made it known that Prince William County ought to pay for the Daughter to attend the selective, expensive private school, the Wakefield School.

42      Prior to Lassiter's current pursuit of subsidized private schooling from Prince William County, Lassiter successfully convinced Prince William County to offer Lassiter 'homebound' education services, whereby Prince William County teachers would provide instructions to the Daughter at home.

43. In meetings and news articles/shows, the Lassiter's complained about lacking any sort of homebound education.  In one instance, Lassiter complained that they did not have qualified homebound teachers, but in actuality, the personnel that the County assigned to Lassiter were qualified, but Lassiter had a problem with the homebound language arts teacher that they characterized as "just a bus driver" prior to demanding that she be fired from her teaching assignment.  In reality, the county was experiencing a serious bus-driving shortage, so that they conscripted teachers to help drive busses. Lassiter's language arts teacher was such a conscript, that is to say, a language arts teacher that volunteered to help students with accessibility issues. The firing-demand nominally originated from the Daughter, who glanced at Lassiter as she delivered the tirade constituting the demand. Lassiter nodded her approval during the Daughter's blatantly scripted demand. Contrary to Lassiter's public assertions, Blankenship monitored Lassiter's demanded services to ensure that the Daughter was supplied with competent teachers.

44. Lassiter had a homebound SPED teacher deliver homebound services. The homebound SPED teacher only lasted a few weeks, because Lassiter was attempting to coerce the teacher to perform multiple unapproved actions, including: (i) demanding that she institute programs that she had no authority to institute; (ii) Lassiter would overwhelm the teacher with non-stop complaints concerning past acts and non-stop speculative, unprovable concerns for the Daughter's cognitive/psychological disabilities such that Lassiter monopolized homebound instruction time that was allotted for her daughter; and (iii) the assistant principle had to resort to personal contacts,

i.e., his wife, to engage in the Math homebound services because no one else would assist. Lassiter's screaming, hate-filled invectives had become notorious in Prince William County.

45.    Lassiter has a convoluted history of manipulating her Daughter and exaggerating, if not falsifying, her Daughter's medical and cognitive attributes for the purposes of acquiring status, money, benefits, and attention. Therefore, her acts in these allegations are willful and calculated. Furthermore, the anguish undergone by the employees of Prince William County in attempting to aid the Daughter is significant and extreme.

46.    Lassiter submitted a medical doctor's analysis by a Doctor Ronald Federici that she knew to be false based on the analysis the Daughter's cognitive capacity ("False Analysis").

47.    Lassiter knew that the False Analysis was performed by a doctor that had been suspended by the Virginia medical board.

48.    The False Analysis was the basis for all of the alleged cognitive deficiencies claimed by Lassiter that were used to acquire videos concerning the creation of IEDs for the Daughter, which Lassiter then posted on the Internet for mass consumption and the defamation of Plaintiff.

49.    Defendant did not seek a supplemental opinion, notwithstanding her knowledge of the False Analysis.

50.    Defendant has brought the genesis of legal proceedings against Prince William County and Blankenship, in which Blankenship, in an agency hearing of December 5, 2023 was subjected to questions concerning her competence in creating an IED for the Daughter.

51.    The aforementioned "Social Scientist" questioned Blankenship's capacity to create and IED for the Daughter notwithstanding the existence of the False Analysis documents.

<u>CLAIMS FOR RELIEF</u>

**Count I. Declaration of Rights**
***Violation of Civil Rights, 42 U.S.C. § 1983***

52.     Plaintiff incorporates herein by reference all preceding allegations of this Complaint as though fully set forth herein.

53.     An actual and justiciable controversy exists between Blankenship and Lassiter exists as to whether Blankenship is in violation of the Civil Rights Act, including 42 U.S.C. § 1983 ("Civil Rights Act"), through the denial of the civil rights of Lassiter and/or the Daughter generally, or specifically, as threatened through rights granted by the Americans With Disabilities Act, 42 U.S.C. § 12101 et seq. and 20 U.S.C. § 1400 et. seq ("IDEA"), through the denial of the educational benefits related to Lassiter and/or the Daughter generally. Lassiter has brought the genesis of a civil action against Prince William County in which Blankenship was alleged to be principally blamed.

54.     Blankenship has not denied Lassiter and/or the Daughter her/their civil rights.

55.     Based on the explicit threats of Lassiter, Blankenship is entitled to a judgment declaring that she has never violated, and is not in violation of, the Civil Rights Act or related statutes.

**Count II. Defamation**

56.     Plaintiff incorporates herein by reference all preceding allegations of this Complaint as though fully set forth herein.

57.     Lassiter made false and defamatory statement concerning Blankenship, to third parties knowing that the substance of the statements were false, or that Lassiter should have known to be false, and Lassiter's fault in publishing the statements amounted to at least negligence, including:

A.  That the Daughter had cancer and that employees of Prince William County, including Blankenship, violated the law in order to oppress and otherwise torment the Daughter.

B.  That the Daughter had a cognitive learning disability and that employees of Prince William County, including Blankenship, failed to provide her with appropriate accommodations.

C.  That the Daughter had a learning disability and that employees of Prince William County, including Blankenship, SPED plans.

D.  That the Daughter had a learning disability and that employees of Prince William County, including Blankenship, fabricated results.

E.  That Blankenship refused, or otherwise without reason, failed to attend a meeting pertinent to the Daughter's civil and IDEA rights.

F.  That Blankenship was gaslighting Lassiter when claiming that the Daughter was required by applicable laws and regulations to fill out a pass to leave class.

G.  That Blankenship did not believe that autists can attend law school, and therefore fabricated the Daughter's answer to "cosmetologist."

58.     These Defamatory Statements were unprivileged, and communicated to a third party.

59.     These Defamatory Statements amounted to at least negligent on the part of the Defendant.

60.     Because the Defamatory Statements concerned professional, moral, and criminal activities of the Plaintiffs, they are *per se* defamatory and constitute special harm.

**Count III. Violation of Va. Code Ann. § 18.2-152.1, et. seq.**
***The Virginia Computer Crimes Act***

20

61.     Blankenship incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

62.     Lassiter with the intent to coerce, intimidate, or harass Blankenship, used a computer or computer network to communicate obscene, vulgar, profane, lewd, lascivious, or indecent language, or threatened illegal or immoral acts,

63.     Lassiter with used a computer or computer network, without authority and obtained property or services by false pretenses.

64.     Lassiter maliciously sent an electronically transmitted communication containing a false representation intended to cause Blankenship to spend money, and such false representation caused such Blankenship to spend money.

65.     Blankenship sustained damages as a result of Lassiter's breach of the Virginia Computer Crimes Act.

### Count IV. Violation of 18 U.S.C. § 2701 et. seq.
### *The Stored Communications Act*

66.     Blankenship incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

67.     Lasssiter ntentionally accessed without authorization a facility through which an electronic communication service is provided or intentionally exceeded an authorization to access that facility; and thereby obtained, altered, or prevented authorized access to a wire or electronic communication while it is in electronic storage in such system

68.     Blankenship was irreparably damaged by Lassiter's unlawful acts described herein.

69.     Blankenship is entitled to punitive damages in an amount to be determined by a jury, but not less than $1,000,000.00.

**WHEREFORE**, Plaintiffs pray for judgment:

A.      That Blankenship is entitled to her damages, including compensatory damages of $120,000.00

B.      That Blankenship be awarded punitive damages related to the unlawful actions of Lassiter in comportment with Va. Code Ann. § 8.01-38.1 for state law claims, such as VA Code Ann § 59.1-338 of $350,000.00

C       That Blankenship be awarded punitive damages related to federal claims of this case, not less than $1,000,000.00

D       That Blankenship be awarded her attorneys' fees for this action.

E.      That Blankenship be declared not in violation of Lassiter and/or Daughter's Civil Rights (including the ADA) or IDEA.

F.      That Lassiter, and her officers, agents, servants, and employees and those persons in active concert and participation with or controlled by any of them, be preliminarily and permanently enjoined and restrained from discussing Blankenship by name, image, or inference.

G.      That Blankenship be awarded her costs in this action.

H.      That Blankenship be awarded such further relief as this Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury pursuant to Fed. R. Civ. Pro. 38 as to all issues triable of right to a jury.


DATED: January 5, 2024

*M. Keith Blankenship*

By _____
    M. Keith Blankenship, Esq.
    Attorney for (and husband of) Plaintiff
    VSB# 70027
    Da Vinci's Notebook, LLC
    9000 Mike Garcia Dr
    No. 52
    Manassas, VA 20109
    703-581-9562
    keith@dnotebook.com